RACHEL ANN CARPENTER *et al.*

*v.*

JOSEPHINE CALVERT.

1. WILL—*mental capacity to make.* It is not required that a person, to make a valid will, shall possess a higher capacity than for the transaction of the ordinary affairs of life. The rule is the same in the case of a sale of property and its disposition by will.

2. The law does not require that the testator should have sufficient mental capacity to understand and know the extent of his property, who his relatives are and their claims on his bounty, and how he wishes to dispose

Opinion of the Court.

of his property, and that he should also have sufficient capacity *to hold all these things in his mind at the same time.*

3. SAME — *validity does not depend upon its judiciousness.* It is not proper, on the contest of a will, by the instructions or otherwise, to invite the jury to examine and pass upon the question whether the will is a just, wise and a proper disposition of the testator's property.

4. EVIDENCE—*relevancy as to mental capacity.* On a contest respecting the validity of a will which is sought to be avoided for want of sufficient mental capacity, testimony as to improper conduct on the part of the testator, or that one of the devisees had attempted to cast shame and disgrace upon the memory of the testator, is irrelevant, and should not be admitted.

5. SAME—*opinions.* On a bill to contest the validity of a will, it is not proper to allow witnesses to express opinions as to whether the supposed influence of one of the devisees over the testator sprang from affection or fear. The witnesses should state the facts, and leave the jury to draw the inferences from such facts.

6. Where the proofs show facts evincing sufficient capacity in a testator to transact his ordinary business about the time of making a will, the opinions of witnesses as to a want of capacity are entitled to but little weight on the question.

7. SAME—*weight of medical opinion as to testamentary capacity.* Physicians may be regarded as experts as to the condition of the body and as to what diseases tend to impair the mind of a testator, but it does not follow, from the mere fact they are physicians, that they are any better judges of the testator's mental capacity than other men of good, common sense.

8. BURDEN OF PROOF — *as to testamentary capacity.* The burden of proof rests, in the first place, upon the party seeking to establish a will, to show that the testator, at the time of making the will, was of sound mind; but when this is shown, the presumption in favor of sanity applies, and the proof on the part of the contestant must not only neutralize the proof of sanity, but also the presumption of sanity in such case.

APPEAL from the Circuit Court of Henry county; the Hon. GEORGE W. PLEASANTS, Judge, presiding.

Mr. LEVI NORTH, and Mr. GEO. W. SHAW, for the appellants.

Mr. E. C. MODERWELL, and Mr. CHARLES DUNHAM, for the appellee.

Mr. JUSTICE DICKEY delivered the opinion of the Court:

Lydia W. Nandain, a resident of Geneseo, Illinois, died at Philadelphia, July 6, 1873, leaving as her last will an instru-

64          CARPENTER *et al. v.* CALVERT.          [Sept. T.

Opinion of the Court.

ment, which was admitted to probate on the 20th of October, 1873.

Mrs. Nandain, at the time of her death, was about 75 years of age. She was married in 1831 to John Burnham, and, after his death, was married to Dr. Thomas Nandain, in 1836, with whom she lived until December 21, 1872, when he died.

Some fourteen years before her first marriage to Burnham, Mrs. Nandain, whose maiden name was Lydia W. Hough, being unmarried, became a mother, and the child was called Josephine Hough. This child afterwards became the wife of Dr. Calvert. Mrs. Nandain had no other children.

By this will of Mrs. Nandain, her house and lot in Geneseo, and furniture, were devised to her niece, Rachel Ann Carpenter; her wardrobe and jewelry were bequeathed to Jemima W. Carpenter, Lizzie C. Hall and Rachel Ann Carpenter, to be divided as her niece, Rachel, and her daughter, Josephine Calvert, should direct. To her daughter, Josephine Calvert, she gave $300; to her grandson, Harry Calvert, $300; to her granddaughter, Mrs. Elizabeth Gender, $300; to her nephew, James Walter, $300; to Mrs. Sarah Granger, $100; to Jemima Carpenter, $300; to Lizzie C. Hall, $300; to Sally C. Worth, $300; to Edward G. Carpenter, $300, and to Frank G. Carpenter, $300.

In her will, the testatrix expressed the hope that Mrs. Jemima Carpenter and family should come to Geneseo and reside at the homestead left to her niece. By this will, the residue of her property is left to Rachel Ann Carpenter. George W. Shaw and W. Sanford were appointed executors.

Josephine Calvert filed her bill in chancery in the circuit court of Henry county, seeking to set aside this will. The bill charges that Mrs. Nandain, before and at the time of the execution of the will, was partially insane, not of sound mind and in her dotage, and so weak and feeble in mind as to be incapable of making a proper disposition of her property, and that she was so much under the influence of pain and narcotics that her faculties were stupefied, and she was subject to be unduly influenced against her friends, and subject to insane

and morbid delusions, of which the will was the result. The bill further charges that Rachel Ann Carpenter, her niece, stimulated such delusions, and resorted to falsehood, threats, promises and misrepresentations to induce Mrs. Nandain to execute the will, and that the will was executed under the influence of undue restraint from such threats, and so forth.

Appellants were made defendants, and filed answers, admitting the death of Mrs. Nandain, the execution and probate of the will and the issuing of letters testamentary, but denying all allegations in the bill tending to invalidate the will.

A general replication was filed, and the issues thus formed were tried by a jury at the October term, A. D. 1875. A verdict was rendered against appellants, finding the supposed will of no validity. A motion for a new trial was denied, and thereupon it was decreed by the court that the instrument in writing purporting to be the last will and testament of Lydia W. Nandain, and all proceedings under the same, are null and void. To reverse this decree this appeal is brought.

After a most careful and thorough consideration of the evidence, which is very voluminous, we find no proof tending to charge Mrs. Rachel Ann Carpenter with any improper conduct towards her aunt, the testatrix. The charge, therefore, that the will was the result of undue influence exercised by her, is entirely without support.

The only question of fact which is open to debate upon this record is, whether, at the time of the execution of this will, the testatrix was of sound mind and memory—in other words, whether she was capable of making a will. On this question the whole controversy depends. The testimony of a great many witnesses was taken upon this subject, and while some of them expressed the opinion that she was of sound mind, and had sufficient capacity to make a will, many others expressed the opinion that she had not at the time the necessary capacity. No person, however, with unbiased mind and with a proper appreciation of what necessary testamentary capacity is, can read with care the whole of this testimony without perceiving that those witnesses who have expressed opinions against the testa-

5—83D ILL.

mentary capacity of the testatrix have done so under a great misapprehension as to the degree of mental capacity essential to that end. For instance, Dr. Pomeroy says he does not think she had mind enough to make a will, but explains his views by saying he thinks sufficient capacity to make a will requires a clear understanding and a steady will. He says she might, in the main, know what property she had well enough, and presumes she had capacity to know who her daughter and her niece were, but expresses the opinion that she was "hardly ·competent to make a *judicious* will."

The test of capacity in this record, sanctioned by the circuit court upon the trial, is shown by questions which witnesses were permitted to answer against objection, in which the court substantially held that it was essential to testamentary capacity that the testatrix should have had sufficient mental capacity to understand and know the extent of her property, who her relatives were, and what were their claims upon her bounty, and how she wished to dispose of her property, and that she should have had mental capacity *to hold all these things in her mind at the same time.*

Metaphysically this proposition may not be unsound; but the proposition itself, when submitted to the mind of a witness, or presented to a juror, as the standard or test of testamentary capacity, is calculated to mislead an ordinary mind, and to present a standard far above that which the law really requires.

In *Meeker et al.* v. *Meeker*, 75 Ill. 266, it was said, that "a person who is capable of transacting ordinary business is also capable of making a valid will. It is not required that he shall possess a higher capacity for that than for the transaction of the ordinary affairs of life. A man capable of buying and selling property, settling accounts, collecting and paying out money, or borrowing or loaning money, must usually be regarded as capable of making a valid disposition of his property by will. The rule is the same in the case of a sale of property and its disposition by will, and the usual test is, that

the party be capable of acting rationally in the ordinary affairs of life."

This doctrine, thus laid down by this court, is referred to with approbation in the opinion of the court, in *Rutherford et al. v. Morris et al.* 77 Ill. 410, and that important case was made to turn upon the rule as thus stated.

Testing this case by this rule it is impossible for any reasonable man to say, with truth, that the testatrix, on January 6, 1873, was not capable of making a will. Her letters, written to Harry Calvert, January 14, 1872, and on February 25, 1872, and her letter to Mrs. Gender, of March 6, 1872, and her letter of March 14, 1872, to Harry Calvert, and of April 19, 1872, and her letter to Mrs. Gender, of October 29, 1872, give inherent and conclusive evidence of her abundant mental capacity for the transaction of ordinary business at any time between the months of January and November, 1872. During the months of November and December, being the two months next preceding the date of the will, we have, in the conversation and conduct of Mrs. Nandain, as exhibited in the proofs, the most satisfactory evidence of her vigor of mind and capacity to transact business. It is true that she was suffering from disease, that she was much worn and depressed by the fatigue and labor of waiting upon her dying husband, but in all the varied scenes during those two months, in which Mrs. Nandain is introduced and her conversation given in the record, no act is shown and no utterance or expression is proven tending, in any degree, to show the want of mental capacity sufficient for the transaction of ordinary business. On the contrary, we find her corresponding with her niece for the purpose of securing her services in assisting in taking care of her husband. We find her looking carefully after the details for the expenses of the family; we find her discreetly and carefully looking after her pecuniary interest, about the time of the doctor's death, in her negotiations in relation to the return, to the manufacturer, of a coat, which the doctor had bought but which he had not used, and in her negotiations in relation to a stove which had been ordered before the

68          CARPENTER *et al.* *v.* CALVERT.          [Sept. T

Opinion of the Court.

doctor's death and was not delivered until the day on which he died.

The testimony of those who question her capacity tends to show that her mental vigor was gradually failing with her failing strength, and that she was less capable, in the latter part of March, 1873, when she left Geneseo, for the transaction of business, than she was in the early part of January, when this will was made; yet we find that she shows abundant capacity for the transaction of ordinary business in making her arrangements for her departure to Philadelphia. With prudence, caution and discretion, she arranges for the occupancy of her house by Mrs. Brooks, and makes the purchase of tickets and appropriate drafts preparatory to her journey. On the 26th of February, 1873, we find she had capacity to collect the interest due upon a note, which was held against W. W. Smith, for $500, and knew how to compute the interest, count the money, and draw the receipt, which is very artistically written, distinctly expressing the transaction. On the 15th of January, 1873, the executors of her husband's estate, in preparing an inventory, called upon her for information. She there gives evidence of abundant capacity for the transaction of ordinary business; she produces his notes and accounts with readiness and promptitude, and designates distinctly the articles of personal property about the house which belonged to her husband's estate, and those which belonged to her. On the 25th of January she had a discussion with William W. Smith, one of complainant's witnesses, about the will of her husband, and about the question of whether there existed an ante-nuptial contract between her and Dr. Nandain.

No one can read the account given by the witnesses of this conversation without perceiving that Mrs. Nandain, at that time, had abundant mental capacity for the transaction of ordinary business, and was fully qualified to make a will. Afterwards Judge Waite and the other executor of Dr. Nandain's estate, called upon her and negotiated with her in relation to the relinquishment of an award of $1000 made in her favor by the appraisers, to be allowed out of her husband's

estate. These gentlemen seem to have regarded her as abundantly competent to transact that business. Her release was accepted and acted upon, and we do not learn that it was ever called in question on account of her supposed incapacity to make it.

It is unnecessary to discuss, in this case, all the facts and details, which are so convincing that Mrs. Nandain had adequate testamentary capacity at the time of the making of this will. It is sufficient to say, that no witness has attributed to her any act showing any want of such capacity, or any remark betraying imbecility. On the contrary, witnesses with whom she conversed testified that she ever conversed rationally. The mere opinion of witnesses can weigh but little, on a question of this kind, against the manifest facts.

Nor is it strange that the jury should have been misled in their verdict in this case. Not only was a standard of mental capacity, higher than that required by law, presented to the jury as the true measure, but it appears from this record that much irrelevant and incompetent testimony was allowed to go before the jury calculated to affect their prejudices and lead them to judge harshly of the will in question. The attempt to show that Mrs. Nandain had acted dishonestly in relation to a chain mentioned in her husband's will, ought not to have been permitted. It was especially improper that the witness should have been allowed to state that he had ascertained certain facts on that subject "from a reliable source." The testimony was hearsay and untrustworthy, and the subject matter of the testimony was foreign to the issue.

Another matter entirely foreign to the issue, and well calculated to prejudice the jury against Miss Carpenter (one of the appellants), was permitted improperly to be brought before the jury. Proof was allowed to be given to the jury tending to show that she had ungratefully attempted to cast shame and disgrace upon the memory of her aunt, by mentioning the fact that Mrs. Calvert was an illegitimate child. It does not appear that Miss Carpenter ever alluded to this matter until the validity of the will was questioned, and it had been sug-

gested, as against the will, that it was strange that no more liberal provision had been made in the will for the daughter, Mrs. Calvert. In answer to this suggestion, and as tending in some measure to explain this, the matter of the illegitimacy of Mrs. Calvert seems first to have been alluded to by Miss Carpenter. Be this as it may, the question was not before that jury to be tried. They had nothing to do or say on the question whether Miss Carpenter had acted gratefully or ungratefully, nobly or meanly. The testimony given upon that subject could shed no light whatever upon the question of the testamentary capacity of the testatrix at the time of the making of the will.

Witnesses were permitted improperly to express opinions as to whether the supposed influence of Miss Carpenter over Mrs. Nandain sprang from affection or fear. Such opinions were incompetent testimony. It is the business of witnesses to give the jury facts within their knowledge, and it is the business of the jury to form opinions as to the inference to be drawn from these facts.

The whole tenor of the trial and the spirit of the instructions seemed to invite the jury to examine and pass upon the question whether the will in controversy was a just, wise and proper disposition of the property of the testatrix. This is not a question to be determined by the jury. The owner of property has the lawful right to dispose of the same as he or she may choose, and such disposition of the property is valid, whether it be reasonable or unreasonable, just or unjust. The owner of property, by law, has the right to dispose of it, in life, for the mere gratification of the whims of the owner, and in the same degree the owner of property has the power to dispose of it by will. A will may be a very injudicious will. and a very unwise will, and yet may be a very valid will. It is sufficient if it be made according to the forms of law, by a testator or testatrix capable, in law, of making a will, and of sound mind and memory at the time of making the will.

The court charged the jury, in substance, that all other things being equal, they should give greater weight to the opinions of physicians, on the subject of the testamentary

capacity of the testatrix, than to other witnesses. This position is not sustained by authority or reason. Physicians may be regarded experts as to the condition of the body, and as to what diseases tend to impair the mind, but it does not follow, from the mere fact that they are physicians, that they are any better judges of the degree of mental capacity than other men of good, common sense.

The language in which the instructions are couched, relating to the burden of proof, is calculated to mislead the jury. It is true that the burden of proof, to show the testator is of sound mind at the time of making the will, rests upon the party claiming that the will is valid; and it is also true that, before a will can be admitted to probate, or held to be valid, affirmative proof must be given of the testamentary capacity of the testator or the testatrix at the time of making the will; but this proposition in nowise affects that other rule of law, that all men are presumed to be of sound mind until the contrary is proved. Our statute, from an abundance of caution, provides that, in the first instance, the validity of a will shall not rest merely upon this presumption of law, arising from the fact that the will was duly executed, but requires that the witnesses who subscribed to the will shall testify affirmatively to the testamentary capacity of the party making the will. When this has been done, however, and contradictory testimony is produced tending to show want of necessary testamentary capacity, the party asserting the validity of the will must prevail, unless the contradictory testimony be sufficient to overcome or neutralize the effect, not only of the affirmative testimony given in favor of the validity of the will, but also to overcome or neutralize that presumption arising from the general rule of law, that all men are presumed sane until the contrary is proven. In weighing the conflicting proofs, the party supporting the will is entitled to the benefit of this presumption.

The decree of the court below must be reversed, and the cause remanded for a new trial in conformity with the views expressed in this opinion.

*Decree reversed.*