WILLIAM HENRY BRAINARD *et al.* Appellees, *vs.* CHARLES
ASHAEL BRAINARD *et al.* Appellants.

*Opinion filed October 28, 1913.*

1. WILLS—*opinion of non-expert must be based upon the facts
stated.* A non-expert witness in a will contest case, after detail-
·ing the facts upon which he bases his opinion as to the testator's
condition of mind, may express his opinion to the jury, and such
opinion is to be received by them and given such value as the facts
detailed and apparent intelligence of the witness, and his capacity
to form an opinion, may warrant.

2. SAME—*when opinion of non-expert is entitled to no weight.*
An opinion of a non-expert witness that a testator is not of sound
mind and memory is entitled to no weight, where he states no facts
or circumstances which could induce a reasonable belief of the
testator's unsoundness of mind.

3. SAME—*whether arterio-sclerosis has affected the mind is a
question of fact.* Whether arterio-sclerosis has affected the mind
of the testator is not a question which is settled by mere proof
that the testator was afflicted with the disease and that the tend-
ency of the disease is to affect the mind, but the question must be
determined by the proof in the particular case.

4. SAME—*when fact that testator did not transact business per-
sonally is not of great weight.* The fact that the testator, for sev-
eral years prior to making the will, is not shown to have transacted
business personally is not entitled to great weight as bearing upon
his mental capacity, where his son attended to his affairs and
it is not shown there was considerable business to transact, and
where it appears indirectly from the evidence that the testator had
had a conservator, who was discharged by the court shortly be-
fore the will was made.

5. SAME—*when fact that the proponents had witnesses exam-
ine the testator does not cast doubt upon his capacity.* The fact
that the proponents, before the will was made, requested those
who witnessed the will to examine the testator for the purpose of
determining whether, in their opinion, he was of sound mind, does
not show that they themselves were in doubt upon the matter nor
cast any doubt upon the testator's mental capacity, particularly
where it appears that shortly before the·will was made the con-
servator who had been acting for the testator was discharged.

6. SAME—*when admitting statement of beneficiary as to testa-
tor's mental condition is not error.* In a will contest case, where
the subject of the testator's mental condition is gone into from a

time prior to the execution of the will up to the time of his death, it is not error to admit in evidence a statement of his son, who was really the sole beneficiary of the will, made shortly after the will was executed, with reference to testator's mental condition.

7. SAME—*when instruction as to mental capacity is confusing.* An instruction stating that a person, in order to make a valid will, should be of sound and disposing mind and memory, and that what is meant by soundness of mind is that the mind should be in such "vigor and power" and that its "machinery and faculties should be in such working order" that the testator comprehends and understands the nature and effect of the instrument, is confusing and misleading in using the terms "vigor and power" and "machinery and faculties," and in such form should be refused.

8. SAME—*when instructions as to mental capacity are not erroneous.* Instructions for the contestants which lay down a correct rule as to the mental capacity of the testator and then authorize the jury to find that the instrument in question is not his will if they believe, from "a preponderance" of the evidence, that he did not possess sound mind and memory, are not erroneous as disregarding the presumption of sanity. (*Norton v. Clark,* 253 Ill. 557, distinguished.)

9. SAME—*testator should know natural objects of his bounty and realize their claims.* In order to be of sound mind and memory the testator must have capacity enough to know the natural objects of his bounty and realize the claims they have upon him.

10. SAME—*when instructions are improper.* Instructions stating that a testator is incapable of making a will if his mental condition is such that he does not know or comprehend his *just* relations to the natural objects of his bounty, and that a will is not valid unless the testator is capable of knowing whom he is *depriving* of his property, as heirs or devisees, are improper and it is error to give them.

11. SAME—*the testator's right to dispose of his property as he chooses is absolute.* A testator has the absolute right to make such disposition of his property by will as he sees fit, and it is immaterial whether that disposition may be regarded by others as reasonable or unreasonable, just or unjust.

12. SAME—*when an instruction as to considering the will itself as evidence is too broad.* Where the single issue is whether the testator possessed sufficient mental capacity to make a will, an instruction that the jury, in determining whether the paper in question is the will of the testator, may consider the alleged will itself as evidence, is too broad, even though it states that the will should be considered in connection with all the other evidence in the case.

FARMER, J., specially concurring.

APPEAL from the Circuit Court of Henderson county; the Hon. HARRY M. WAGGONER, Judge, presiding.

HANLEY & COX, and SCOFIELD & CALIFF, for appellants.

HARTZELL, CAVANAGH & BABCOCK, O'HARRA, O'HARRA, WOOD & WALKER, and McLAUGHLIN & ROBINSON, for appellees.

Mr. CHIEF JUSTICE COOKE delivered the opinion of the court:

Charles Henry Brainard died at his home in Henderson county on March 25, 1912, leaving him surviving Minerva R. Brainard, his widow, and Charles Ashael Brainard, Elmira E. Epperly and William Henry Brainard, his children, as his only heirs-at-law. Afterwards an instrument was admitted to probate by the county court of Henderson county as and for his last will and testament. By this will, which was dated December 1, 1911, the testator devised to his wife, for and during her natural life, a lot in the village of Kirkwood, in Warren county, as a homestead, and directed that there be set off to her, dower in all the lands of which he should die seized, and bequeathed to her one-third of his personal estate remaining after the payment of his debts. All the remainder of his estate was devised and bequeathed to his son Charles Ashael Brainard, and it was further provided that all notes, contracts and other evidences of indebtedness held by the testator against Charles Ashael Brainard, "and particularly a certain contract made by H. F. McAllister, my former conservator, with my son, the said Charles A. Brainard," be canceled and delivered up to Charles Ashael Brainard. On September 23, 1912, William Henry Brainard and his wife, Elmira E. Epperly and her husband, and Minerva R. Brainard, filed their bill of complaint in the circuit court of Henderson county against Charles Ashael Brainard and his wife,

and Everett C. Hardin, as executor of the last will and tes-
tament of Charles Henry Brainard, to contest the validity
of said will. The bill charged mental incapacity and fraud
and undue influence, but was afterwards amended by strik-
ing out the charges of fraud and undue influence. An issue
at law was made up and submitted to a jury, who, after
hearing the evidence, returned a verdict finding that the in-
strument in controversy was not the last will and testament
of Charles Henry Brainard. After overruling a motion
for a new trial the court entered a decree setting aside
the probate of said will. From that decree Charles Ashael
Brainard and his co-defendants have prosecuted this appeal.

It is first urged that the verdict and decree are mani-
festly against the weight of the evidence.

At the time of his death Charles Henry Brainard was
about eighty-two years of age. For some time prior to
the execution of the will in controversy he had been af-
flicted with certain diseases incident to old age, such as ar-
terio-sclerosis, kidney trouble, rheumatism and heart trouble,
and, at times, constipation and diarrhœa. He owned 412
acres of land near Gladstone, in Henderson county, and
for several years prior to 1910 lived on this farm with his
daughter, Mrs. Epperly, and her husband. While there is
no direct evidence on the subject, the only inference that
can be drawn from the testimony is that during the last
years of his life he and his wife had not been living to-
gether. During the early part of 1910 the testator left his
farm and went to Gladstone to live with his son Charles
Ashael Brainard, (referred to by the witnesses as Ashael
Brainard,) who was engaged in the mercantile business in
Gladstone. During the same year Mrs. Epperly and her
husband also left the farm, which was thereafter leased to
tenants. While no records were introduced showing the
appointment of a conservator for Charles Henry Brainard,
yet it clearly appears from the testimony of the various
witnesses, and from the provisions of the will itself, that a

conservator had been appointed for him some time prior to 1910, and that shortly before the execution of the will in controversy a hearing was had in the county court of Henderson county, which resulted in the removal of the conservator. It also appears from the evidence that the testator had previously executed two wills during the year 1911, one in September and another in October.

Three physicians, and seven other persons who had seen the deceased during the last year of his life, testified on behalf of the contestants concerning his mental condition during that period. Dr. C. J. Eads, who lives in Oquawka, in Henderson county, testified that he had been his family physician until five or six years prior to his death but had seen him only once during the last year of his life; that on or about October 16, 1911, at the request of Brainard's wife and the attorneys for the contestants in this case, he, accompanied by his partner, Dr. F. E. Kaufman, went to Ashael Brainard's home for the purpose of determining the mental condition of Charles Henry Brainard; that the witness talked with him but does not recall the conversation; that they talked about things that had occurred several years before and about current events, and that the witness asked him to read some, but that "he did not seem to make anything out of it;" that he did not consider him of sound mind and memory; that he seemed to be very much enfeebled physically, suffering from degenerated arteries, which in many instances has a tendency to affect the mind; that he would not say positively that it affected Brainard's mind but thought it did; that he did not thereafter see him, and had not seen him for over a year prior to this examination; that he talked to Brainard a little about farm matters but did not ask him about his land in particular; that Brainard told him who was on his farm; that the witness did not ask him anything about his children; that when the witness went into the room he spoke to Brainard and Brainard spoke to him; that Brainard had not seen the witness

for more than a year and did not seem to recognize him until he got a good look at the witness, and that then, "of course, he knew me;" that the examination lasted only about thirty minutes, and from this limited examination he would not undertake to make a positive statement as to the effect of Brainard's physical ailments upon his mind. From Dr. Kaufman's testimony it appears that this examination was made for the purpose of qualifying these physicians to testify at the hearing upon the petition for the removal of the conservator. He testified that he asked Brainard some questions but does not remember what they were; that he could not say whether he was of sound or unsound mind, but that in his opinion he was of unsound mind and memory. On cross-examination he testified that he first entered into conversation with Brainard to determine the condition of his memory; that he did not talk to him about his farm or about what property he had or how his land was being farmed, nor did he talk to him about his children, or about a will or deed, or whether he knew the difference between such instruments; that he merely talked to him about events of the past.

Dr. G. E. Luster, a physician of Galesburg, Illinois, testified that on August 26, 1911, he was called to see Brainard in consultation with Dr. Ditto, Brainard's attending physician; that he found Brainard lying in bed at his son's home, in Gladstone; that he made an examination and talked to him some; that his physical condition was very bad; that he was suffering from an advanced condition of atheroma of the arteries,—an exceedingly advanced condition,—so much so that the arteries felt more like pipe-stems than normal arteries, and that there was very little blood going through the arteries; that he simply examined Brainard as to his physical condition; that the disease of the arteries would be very apt to produce a starved condition of the brain as well as of the entire system; that his disease was progressive, and that he told Dr. Ditto that his

case was hopeless, and that he would go from bad to worse and would die within a short time; that he did not test his memory, but on general principles, considering his diseased condition, does not think that he was of sound mind and memory. On cross-examination this witness testified that the conversation which he had with Brainard related entirely to his physical condition and that he did not talk to him about past or current events or politics; that Brainard was drowsy and complained of pain in his limbs; that he sat up in bed, pulled up the cover and showed the witness his limbs; that his opinion with reference to his mental condition is based entirely "on the pathological condition or diseased condition—on general principles;" that he did not see Brainard again and does not know anything about his condition afterwards.

David S. Bryan, a justice of the peace of Gladstone, had known the deceased for about six years. He testified that during the last year he frequently saw Brainard and that he talked with him once or twice; that on one occasion he went to Brainard's home with Brainard's attorney to take his acknowledgment to a petition for the removal of a conservator; that he asked Brainard whether he knew the contents of the document, and that Brainard said that the attorney had read it to him; that he had other conversations with him during that year but could not repeat them; that he saw him frequently and noticed his condition; that from what he saw and from the conversations he had with Brainard he does not think he was of sound mind and memory.

Joseph Logan, a farmer living near Gladstone, had known the deceased all his life and saw him frequently up to within a year of his death. He testified that during the last year of his life he saw him only a few times and talked to him very little; that he noticed his appearance and actions at those times; that he does not remember the substance of any conversation; that he does not think that he was of sound mind and memory. On cross-examination this wit-

ness stated that he saw Brainard three or four times during the last year of his life, the last time being in August or September of 1911, in Ashael Brainard's yard; that the witness tied his horse to a hitching-rack outside the yard and went across the yard to a blacksmith shop; that Brainard did not say anything to him and he did not say anything to Brainard; that prior thereto he met Brainard on the sidewalk; that he did not stop and talk with him; that the witness spoke to Brainard and Brainard spoke to the witness; that he saw him once or twice at Ashael Brainard's store but had no conversation with him; that they merely spoke to each other and passed on; that he does not remember any conversation at all; that he does not remember of talking with him about his family, his children or his property, and does not remember of asking Brainard about anything during the last year that Brainard did not remember.

Louis Morris, a farmer living near Gladstone, had known Brainard for fifteen or sixteen years. He testified that he saw him twice during the last year of his life at Gladstone and had a short conversation with him; that the year previous he had met him frequently and had conversed with him on general topics; that in his opinion Brainard was not during that time of sound mind and memory. On cross-examination this witness testified that the last time he saw Brainard was in June or July, 1911, at his home in Gladstone; that he was in a lawn swing and the witness was crossing the yard; that he spoke to' Brainard and Brainard tried to speak to him; that he made some kind of noise, but the witness does not know what he said and that he (Morris) did not stop. He further testified that this occasion was not the only one upon which he based his opinion; that he had seen him before that at Ashael Brainard's store; that the witness spoke to Brainard and Brainard spoke to the witness, and that they had a conversation, but the witness could not remember anything that was said during the conversation or what the conversation was about. Mor-

ris was then asked: "Now, are those the two occasions up-
on which you base your opinion he was not of sound mind
and memory?" and replied: "No, sir; the times before.
Well, I can't just tell you; I think it was four years ago;"
but the witness did not detail anything that occurred four
years ago.

Taylor Galbraith testified that he had lived in Gladstone
about twenty years and saw Brainard at his home frequently
during the last year of his life as the witness was hauling
sand and dirt past the Brainard home; that on one occa-
sion, in August, 1911, as he was passing with a load of
dirt, Ashael Brainard came out and asked him to go in and
see his father and talk to him with a view of determining
whether he was of sound mind and memory, and informed
him that he wanted him to witness his father's will in the
near future, and mentioned the names of five other persons
who would also sign as witnesses; that he (Galbraith)
went in and talked to Charles Henry Brainard for five or
ten minutes, and that about two weeks later he was called
to witness the will, which was executed in September, 1911;
that he had no conversation with Brainard on this occasion
and did not hear him talk to anyone; that he saw the will
lying on the table; that it was read over to Brainard, but
that he (Galbraith) did not want to hear it read and re-
mained out in the yard; that he signed this will as a wit-
ness, but in his opinion Brainard was not of sound mind and
memory at that time.    On cross-examination this witness,
after testifying that he had signed a will in September,
1911, as a witness, was asked: "Didn't you understand at
that time that if a man wasn't of sound mind he couldn't
make a will or any other paper or other contract that would
be binding?" and answered, "Well, yes; I knew that at that
time, and I confine my testimony where I say he was not of
sound mind strictly to the time of the making of that will."

James C. Tollman testified that he had been in the drug
business in Gladstone since 1876; that he knew the de-

ceased and had done some business with him; that he saw
Brainard frequently during the last year of his life and
might have conversed with him some, and that in his opin-
ion he was not of sound mind and memory. On cross-ex-
amination he testified that the last conversation he had with
Brainard was in the summer of 1911, but the witness did
not remember the substance of any conversation between
himself and Brainard.

William Galbraith, a farmer living near Gladstone, knew
the deceased for thirty years. He testified that during the
last eighteen months of his life he saw Brainard from two
to four times a week; that he never had a conversation
with him—that he merely spoke to him; that at times
Brainard would speak to him and at other times he would
not; that on two occasions he was called to Ashael Brain-
ard's home to witness wills, neither of which was the will
in controversy; that he witnessed one will made by Charles
Henry Brainard in September and another one in October,
1911; that Brainard never talked very much; that when
the second will was executed the attorney who drew the
will asked Brainard if that was his will, and that Brainard
replied, "I guess so; I don't know;" that he did not hear
him say anything when the first will was signed, except to
ask the witnesses to sign the will; that in his opinion Brain-
ard was not of sound mind and memory.

Stephen W. Graham, a farmer, had known Brainard
about twenty-six years. He testified that during the last
years of his life he met Brainard frequently and had con-
versations with him; that they talked about the weather
and the crops and the prospects for corn, and that in his
opinion Brainard was not of sound mind and memory.

The above witnesses were the only ones who expressed
the opinion that Charles Henry Brainard was not of sound
mind and memory. None of them referred to anything
said or done by him during any period of his life which
would tend to show that he was not of sound mind and

memory except the witness William Galbraith, who testified
that when he was called to witness a will in October, 1911,
and Brainard was asked if the instrument was his will, he
replied, "I guess so; I don't know." Six other persons
whom Galbraith mentioned as having been present when
this will was executed, in October, 1911, were witnesses in
this case, five of them testifying on behalf of the propo-
nents and one on behalf of the contestants. None of them
made any reference to any such remark having been made
by Brainard on this occasion.

The will in controversy was witnessed by Dr. B. L.
Ditto, Leonard Hedges, F. W. Pence and C. E. Kemp, all
residing in or near Gladstone. These persons all testified
upon the hearing in the circuit court that at the time Charles
Henry Brainard executed this will he was of sound mind
and memory. In addition to this testimony the proponents
offered the testimony of four physicians and eight other
persons, all of whom testified that the testator was of sound
mind and memory at or about the time he executed this will.

Of the physicians who testified in the case, Dr. B. L.
Ditto, who was Brainard's attending physician during the
last year of his life and who was one of the witnesses to
his will, had by far the best opportunity to observe his men-
tal and physical condition. He testified that he had seen
Brainard about one hundred times during the last year of
his life and during that period had treated him profession-
ally thirty or forty times; that on December 1, 1911, when
he executed his will, his mental condition was clear and
good and that he was of sound mind and memory. Re-
garding his physical condition, he testified that Brainard's
health was not first-class when he executed the will; that
he had been sick at intervals before that; that the most se-
vere sick spell was in July and August of 1911; that he
was not sick continuously from July to December, 1911,
but was taking treatment during all that period; that he
was afflicted with arterio-sclerosis,—a condition incident to

old age; that this disease has a tendency to affect the mind, but that he did not see much change in the mental condition of the testator during the last two years of his life; that he also had heart trouble, constipation, rheumatism occasionally, and about the ordinary kidney trouble of men of his age, but that none of these diseases had affected his mind.

Dr. J. W. Holliday, a physician of Burlington, Iowa, was called by Ashael Brainard and Dr. Ditto some time during the fall of 1911 to make an examination of Charles Henry Brainard for the purpose of determining his mental condition. He testified that it was several weeks before "the other court trial," evidently referring to the hearing for the removal of the conservator; that he was with him about an hour and talked with him upon many subjects; that he asked him a number of questions about his memory, his past life, politics, his religion, his business, and other things which would appeal to his intelligence and emotions; that he examined him both physically and mentally, and is of the opinion that he was at that time of sound mind and memory. On cross-examination this witness stated that Brainard talked like a man able to transact business; that he was competent to give his consent in a business transaction but was not physically able to attend to business transactions himself. He further testified that Brainard was afflicted with arterio-sclerosis and was quite feeble, but was able to walk.

Dr. J. M. McClanahan, who has been a practicing physician in Kirkwood, Illinois, for thirty-four years, testified on behalf of proponents that during the summer of 1911 he examined Charles Henry Brainard for the purpose of determining his mental condition, and that in his opinion he was of sound mind and memory at that time. On cross-examination he testified that he found him in reasonably good health for a person of his age; that he was afflicted with arterio-sclerosis, which would have a tendency to im-

pair the strength of his mind; that he would be influenced by anything that would require considerable mental or physical exertion; that anything requiring any considerable business ability would have a tendency to affect his mental condition temporarily; that he saw nothing that indicated that he was anything other than an old man and that he saw nothing that indicated that his mind was not sound; that he did not impress the witness as having sufficient mental capacity to comprehend a large business transaction; that if the disposition of a 400-acre tract of land had required much strenuous and continued thought, in the opinion of the witness it would have been doubtful whether he had sufficient mental capacity to have understood the transaction; that the witness thought he knew what he wanted when he was at rest and everything was favorable. He further testified that he thought Brainard could have been easily bewildered by persons talking to him.

Dr. H. L. Marshall, a physician practicing at Stronghurst, Illinois, was called by Ashael Brainard during October or November, 1911, to examine into the mental condition of Charles Henry Brainard. He testified that he was weak physically and was afflicted with chronic arterio-sclerosis; that he asked him a number of questions about his farm, his tenants and crops, and from this examination formed the opinion that he was of sound mind and memory. He further testified that the physical ailments with which Brainard was afflicted would not necessarily impair the mind; that in his opinion arterio-sclerosis had not developed to such an extent as to impair his mind or weaken his brain; that the general tendency of arterio-sclerosis is not necessarily to weaken the brain but that in some cases it does have that effect; that it had not affected Brainard's brain, and that Brainard had sufficient mental capacity to transact business.

Dr. A. E. Lauver, a practicing physician of Stronghurst, testified that he first examined Brainard during the latter

259 — 40

part of October, 1911, and again during the first part of
November of the same year; that he talked to Brainard
about his farm and the crops it produced and about various
things that happened thirty or forty years ago, and from
these examinations formed the opinion that he was of sound
mind and memory.

Some of the other witnesses who expressed the opinion
that Brainard was of sound mind and memory had seen
and conversed with him only occasionally during the last
year of his life, while others seem to have been intimate
friends of the testator, who frequently called upon him at
his home and conversed with him upon many subjects, and
these witnesses had a much better opportunity to observe
his mental condition than any of the witnesses testifying
on behalf of the contestants.

The attorney who drew the will in controversy was one
of the attorneys for the proponents in this case. At the
hearing he withdrew his appearance as an attorney in the
case and was called as a witness on behalf of the propo-
nents. He testified that on the day the will in controversy
was executed, he, in response to a telephone message, went
to the Brainard home, in Gladstone, and was there requested
by Charles Henry Brainard to draw a will for him; that
he questioned him with reference to the disposition he de-
sired to make of his property, and was directed by him to
draw a will which would provide for his wife in the same
manner as the law would provide for her in case he died
intestate; that she should be given dower in his lands and
the home in Kirkwood during her lifetime, and that the
executor should be directed to sell the balance of his land,
pay his debts, and pay any residue remaining to his son
Ashael Brainard; that the witness asked him what disposi-
tion he desired to make, after the death of his wife, of the
lands in which she should have dower and homestead, and
that he replied that he wanted it to go to Ashael Brainard;
that he also said he wanted the same executor he had nomi-

nated in a former will,—Everett C. Hardin; that he instructed the witness to make it clear in the will that any indebtedness owing the estate by Ashael Brainard should be released by the executor; that in reply to a question by the witness as to what had induced that frame of mind, he said that his son and daughter and his wife were appealing the case against him which had lately been decided in the county court; that they were going to "law him," and that being the case they should have nothing; that after the will was drawn, and before any of the persons who had been requested to witness the will had arrived, he read the instrument to Brainard; that he read it to him clause by clause, from beginning to end; that when he read the seventh clause, which is the clause giving all the remainder of the property to Charles Ashael Brainard, the testator said, "That is right; that is what I want," and that after the whole instrument had been read he said it satisfied him.

The opinion of a non-expert witness that a testator is not of sound mind and memory is entitled to no weight where he states no facts or circumstances which could induce a reasonable belief of unsoundness of mind. While a non-expert witness is permitted to testify and express his opinion that a testator lacked mental capacity, it is only after he has detailed the facts and circumstances upon which that opinion is based that it becomes of any value. After detailing the facts upon which he bases his opinion he may then give that opinion to the jury, to be received by them and given such value as the facts detailed and the apparent intelligence of the witness and his capacity to form an opinion may warrant. (*Roe* v. *Taylor*, 45 Ill. 485; *Snell* v. *Weldon*, 239 id. 279; *Graham* v. *Deuterman*, 244 id. 124.) The fact that with but one exception non-expert witnesses, testifying without objection for the contestants, detailed no facts or circumstances upon which they based their opinion renders their testimony practically worthless.

One of the expert witnesses on behalf of contestants did not express a positive opinion. One of those who did express a positive opinion testified to a theory rather than to an actual condition. He contented himself, largely, with describing the disease with which the testator was afflicted, and stated that because the testator was afflicted with arterio-sclerosis he believed him to be of unsound mind. While it seems to have been conclusively shown that the tendency of the disease known as arterio-sclerosis is to affect the mental condition of a person afflicted with that disease, it does not appear that this is necessarily the result in every instance. Cases have been cited pro and con as to whether arterio-sclerosis necessarily results in mental incapacity. This is not a legal proposition. It is purely medical, and whether that disease in a particular case produces mental unsoundness is a question to be determined by proof in that case.

A careful consideration of all the evidence in this case discloses that the clear preponderance is to the effect that the testator was mentally capable of executing the will in question. It is no argument that it was not shown that the testator had transacted any business during the later years of his life. It was not shown that he had any considerable business to transact. He lived with his son, who cared for him. It appears from the evidence, although no formal proof was made of the fact, that some time prior to the making of this will he had had a conservator, who had been discharged. When the conservator was appointed, the grounds for his appointment, and when he was discharged, do not appear. The record is sufficiently plain on this subject to warrant the inference that the conservator had been discharged shortly prior to the execution of this will. As the contestants did not see fit to make proof of when the conservator was appointed and when he was discharged, it is hardly legitimate for them to seek to take advantage of the fact that it is not shown that the testator personally

transacted any business during the last five or six years of his life.

It is argued that as those who assisted in the preparation of the will requested those who witnessed it to examine the testator with the view of determining whether in their opinion he was of sound mind, they themselves doubted his capacity. There is no force to this argument. The mere fact that the testator had had a conservator appointed for him and had been thereafter restored was sufficient to warrant anyone whom he requested to assist him in the preparation of a will to take this precaution. We do not think this circumstance tends to' cast any doubt upon the testator's mental capacity.

The verdict of the jury was manifestly against the weight of the evidence, and the court erred in not setting it aside and granting a new trial. As the cause must be reversed for this reason and a new trial had, it will be necessary to note some of the objections made to the admission of testimony and to the giving and refusing of instructions.

Appellants contend that the court erred in admitting the testimony of a witness relative to a statement made by Charles A. Brainard in January following the execution of the will, as to his father's condition. As the widow was only given that portion of the estate to which she was entitled as widow, Charles A. Brainard was, in fact, the sole beneficiary. While this statement, as testified to, had little bearing upon the question at issue, it was competent to be proven. (*Egbers* v. *Egbers*, 177 Ill. 82.) As the mental condition of the testator for a time prior to the execution of the will up until the time of his death was gone into, this incident was not, as is contended, too remote in point of time.

Appellants complain of the giving of six instructions on behalf of contestants. The first complained of was No. 11, which is as follows:

"The court instructs the jury that the law requires that a person, in order to make a valid will, should be of sound and disposing mind and memory. What is meant by soundness in this respect is, that the mind should be in such vigor and power, and that its machinery and faculties should be in such working order, that the testator comprehends and understands the nature and effect of the paper writing which he is executing as and for his last will."

The objection to this instruction that it does not confine the question of the mental condition to the time of the execution of the will is not well taken. It could not be understood to apply to any other time. The other objection, as to the use of the words "vigor and power" in reference to the mind, and that the mind's "machinery and faculties should be in such working order," etc., is entitled to consideration. The only purpose of this instruction was to state that to be of sound mind the testator must comprehend and understand the nature and effect of the instrument which he is executing. To inject the language complained of in this instruction had a tendency to confuse and mislead the jury and to cause them to believe that a more active mind was required than the rules of law prescribe. This instruction should not have been given in that form.

By instruction No. 12 the jury were correctly instructed as to the mental capacity required in the testator, and were then told, "if you believe, from a preponderance of the evidence, that he did not have such sound mind and memory at the time he signed the said paper, then you will find that the said paper in dispute is not his last will and testament." By instruction No. 15 the jury were told that unless the testator had such mind and memory as to enable him to understand the nature of the business he was then engaged in and the effect of the disposition made of his property he did not possess that sound mind and memory required by the statute, and concluded almost in the same language as instruction No. 12. It is complained that by these instruc-

tions the presumption of sanity which obtained after the making of the *prima facie* case .on behalf of proponents was disregarded, and that it was error to instruct the jury that they might find, from a preponderance of the evidence, that the testator was of unsound mind, and *Norton* v. *Clark,* 253 Ill. 557, is relied upon. In that case the jury were instructed that if the evidence upon the question of mental capacity or undue influence preponderated in favor of complainant, although but slightly, it would be sufficient for the jury to find in her favor, and we held that it was error to give that instruction, for the reason that it has always been held that the evidence of incapacity must clearly preponderate to authorize the setting aside of a will. The objectionable feature of the instruction there given was the use of the words "although but slightly," which were designed to minimize and practically eliminate the preponderance required. In this case no such attempt was made, but the jury were instructed that if they believed, from a preponderance of the evidence, that he did not have the mind and memory required they should find for contestants. This language could only refer to a substantial preponderance, and the jury could have.regarded it in no other light without putting an unreasonable construction upon it. These instructions do not fall within the rule announced in *Norton* v. *Clark, supra,* but correctly state the law in this particular.

Instruction No. 12 is further complained of for the reason that it states that the testator "must have mental capacity enough to know the claims upon him of the natural objects of his bounty." This instruction was not objectionable in that respect. In order to be of sound mind and memory the testator must have capacity enough to know the natural objects of his bounty and to realize the claims they have upon him.

Instruction No. 14 is objected to for the reason that it states that a testator is incapable of making a will if his mental condition is such that he does not know or compre-

hend his *just* relations to the natural objects of his bounty; and instruction No. 10 is objected to for the reason that it states that a will is not valid unless the testator is capable of knowing whom he is *depriving* of his property as heirs or devisees. These two instructions were improper and it was error to give them. These instructions afforded the jury an excuse to determine whether the will in question was a just and proper disposition of the property of the testator. This is not a question to be determined by the jury. (*Carpenter* v. *Calvert,* 83 Ill. 62; *Nieman* v. *Schnitker,* 181 id. 400.) By making no provision in his will for two of his children the testator was *depriving* them of nothing. They had no interest in his property of which they could be deprived. The testator has the absolute right to make such disposition of his property by will as he may choose, and it is immaterial whether that disposition might be regarded by others as reasonable or unreasonable, just or unjust. *Carpenter* v. *Calvert, supra; Webster* v. *Yorty,* 194 Ill. 408; *Donnan* v. *Donnan,* 236 id. 341.

Instruction No. 17, complained of, is as follows:

"The court instructs the jury that in determining whether the paper in question is the will of Charles Henry Brainard the alleged will itself is proper evidence to be considered in connection with all the other evidence in the case."

There was but a single question presented in the trial of this case affecting the validity of the will, and that was whether the testator possessed sufficient mental capacity to execute a last will and testament. It is only after evidence has been received which tends to prove unsoundness of mind in such a case that the instrument itself may be considered by the jury, and then it must be considered in connection with such evidence. The only purpose of thus considering the will is to assist in determining whether the testator was of sound mind and memory at the time of its execution. An instruction that the jury may consider the will for the

purpose of determining the ultimate fact whether it is the will of the testator, even though it tells them it should be considered in connection with all the other evidence in the case, is too broad, as it affords the jury an opportunity to determine the validity of the will on some other ground than the sole one presented. It was error to give this instruction.

Complaint is made of the action of the court in refusing proponents' instruction No. 21. This instruction was properly refused, as there was no evidence in the record to warrant giving it. It was error, however, for the court to refuse proponents' instruction No. 22, which defined the issue which was presented to the jury and stated that fraud and undue influence were not issues in the case.

For the reasons indicated, the decree of the circuit court is reversed and the cause remanded for a new trial.

*Reversed and remanded.*

Mr. JUSTICE FARMER, specially concurring: I agree with the conclusion reached in the foregoing opinion but do not agree that instruction No. 11 was erroneous. In my opinion it states a correct proposition of law in such language that it could not mislead the jury and was properly given.