EMMA DICKERHOOF et al. Appellants, vs. EDWARD WOOD
et al. Appellees.

Opinion filed February 17, 1915.

1. WILLS—one charging undue influence and a lack of mental
capacity must sustain such charges by proof. One attacking the
validity of a will upon the ground of undue influence and lack of
testamentary capacity must sustain his charges by proof.

2. SAME—what does not justify holding a will invalid. The
mere facts that the testator was sick, feeble and advanced in years,
and that he made an unequal, and to a certain extent an unnatu-
ral, division of his property, are not sufficient to defeat the will.

3. SAME—when the courts cannot declare a will void. Where
neither fraud nor undue influence is shown, the courts cannot de-
clare a will void merely because the testator gives the bulk of his
property to a relative by marriage in preference to blood relatives.

4. SAME—undue influence means wrongful influence. Influence
secured through kindness, care, solicitation or flattery is not such
undue influence as justifies setting aside a will, as influence, to be
undue, must go to the extent of depriving the testator of his free
agency.

APPEAL from the Circuit Court of Cook county; the
Hon. RICHARD S. TUTHILL, Judge, presiding.

GEORGE J. GILBERT, for appellants.

BERNSTEIN, GROSSMAN & BERNSTEIN, (ALECK L.
BERNSTEIN, of counsel,) for appellees.

Mr. JUSTICE CRAIG delivered the opinion of the court:

Appellants, complainants in the court below, filed their
bill in chancery in the circuit court of Cook county against
appellees, defendants in the court below, to contest the will
of John Bazeley, deceased, alleging that the testator was
of unsound mind and under undue influence when the will
was made. Appellee Wood answered denying the material
allegations of the bill. The other appellees answered ad-
mitting the allegations of the bill and denying that the in-

strument in question was the last will and testament of
Bazeley. A jury was waived and the cause was tried be-
fore the court, and the court found the instrument to be the
last will and testament of John Bazeley and dismissed com-
plainants' bill for want of equity. From this decree appel-
lants prosecuted an appeal to the Appellate Court for the
First District, and that court being of the opinion that a
freehold was involved, has transferred the cause to this
court pursuant to the provisions of the statute.

As the sole question involved in the case is one of fact
it will be necessary to review the evidence introduced on
the hearing.

It appears from the evidence that the testator, John
Bazeley, at the time of making the will in question was a
man about eighty years of age. He had been married three
times. Appellant Emma Dickerhoof is a daughter by the
first marriage, and appellees Myrtle Bazeley Wraith and
Blanche Bazeley are grandchildren, being children of a
deceased son, George Bazeley. Appellee Edward Wood is
related to the deceased by marriage, his wife being a niece
of the last wife of the testator. The will in question was
made about three or four weeks before the testator's death
and was drawn by one Joseph Reiter, a real estate agent,
who had no acquaintance with either the testator or the
beneficiaries under the will. The total value of the prop-
erty disposed of is about $1500, consisting of a lot and a
cottage thereon of the value of about $2500, subject to a
mortgage of $1000. By his will the deceased gave $100 to
his daughter, Emma Dickerhoof, and a like amount to each
of his grandchildren, Myrtle Wraith and Blanche Bazeley,
and the balance of his property to appellee Edward Wood,
who was named as executor in the will. It appears from
the evidence that the deceased suffered from a cancer of the
face for some time before his death, and that about a month
or six weeks prior to his death he had a slight paralytic
stroke and was removed from his home to the home of

appellee Wood, where he remained and was cared for by him and his wife until his death. On the day the will was made, Sunday, October 23, 1910, the testator suffered another slight paralytic stroke, and Wood went to Joseph Reiter and told him that there was a party at his house who wanted to make a will. Reiter testified that when they arrived at the house Wood started to tell him what the deceased wanted in the will, and he said to Wood, "Never mind; this man here can still talk and he can take care of himself; let him tell me what he wants put in his will;" that thereupon Bazeley told him what to put in the will; that he then went into another room and there prepared the will and returned to the room where Bazeley was, shut the door, and said, "Now, do you realize what you are doing? Is this really your will?" and he said, "Yes; that is my will;" that the witness said, "Has there been any influence brought on you? Didn't Mr. Wood threaten to put you out of the house, or something like this, if you didn't leave him this?" to which the testator replied, "No, young man; I know what I am doing;" that witness then read the will to him, and said, "That is really what you want, is it?" to which the testator replied, "Yes;" that witness' reason for taking that precaution was that he thought it strange that testator should disinherit his children, and he wanted to be sure that was the way he wanted his will; that after thus satisfying himself in the matter, two neighbors, Henry Kriel and Andrew Shanks, were called in and acted as witnesses to the will. Kriel had known the deceased for several years and saw him nearly every day during his last illness.

All of these parties testified that at the time the will was executed the testator was of perfectly sound and disposing mind and memory and knew and understood what he was doing, and their testimony is corroborated by that of Dr. Parsons, who attended him during his last illness, and also by the Rev. Wright, an Episcopalian minister, who called upon him several times during his illness and administered

the Holy Communion to him. Dr. Parsons testified that he had known the deceased for nearly twenty-five years; that he was a positive character, had his own ideas, and that no one could tell him what to do; that he saw him nearly every day during his illness, and that while he grew gradually weaker his mental condition was very good. The Rev. Wright testified that he became acquainted with the testator about two or three weeks before his death; that when he saw him he was a very sick man; that he expressed a desire to be given the Holy Communion and that he administered the same to him, using the regular ritual communion service of the Episcopal church, and that such responses as were required to be made in the service by the testator were made with accuracy; that his mind was clear and he apparently remembered the service and participated in it.

The only testimony offered upon the part of appellants as to the condition of the testator was that of Emma Dickerhoof and her husband, Hamilton E. Dickerhoof, Myrtle Wraith, Blanche Bazeley and Angie Barney, the former wife of George Bazeley, deceased. Emma Dickerhoof testified that she had not seen her father for about four or five years prior to his death except on one occasion, which was after the death of his third wife and some seven months before the testator's death, at which time she called on him and invited him to come and make his home with her, and that the testator then told her that he was going to stay in the cottage where he was, as long as he could; that she thereafter called at the house two or three times in the evening to see him but found him away from home, and so did not see him again before his death; that the first she knew of his death was when she read of it in the death notices in a newspaper the evening after his death; that in the last conversation she had with him he spoke of his grandchildren, the amount it had cost him to build the cottage in the rear of the lot on which he lived, of his wife's last illness and the trouble he had in caring for her alone

until her death. As to his condition at that time,—four months before his death,—she said: "He seemed perfectly well; my father was not a feeble man; he was a well, strong man for a man of his age." She testified to no fact or circumstance tending in any way to show any impairment of her father's mental faculties or tending to show that he was in any way imposed upon or under the influence of Wood at the time he made his will. The testimony of her husband, Hamilton E. Dickerhoof, is to the same effect. The last time he saw the deceased was several months before his death and about two or three days before his wife saw him. At that time he told the testator his wife was coming over to see him and whatever arrangements he made with her would be all right with him, and also spoke about some trouble there had been between the families, but he testified to no fact or circumstance tending to show that the testator was not of sound and disposing mind and memory. Myrtle Wraith, a grandchild, had not seen the testator for more than three years before his death, and she testified to nothing which indicated in any way that his mind was impaired at that time. Angie Barney testified that she had not seen the deceased for more than three years before his death, at which time, so far as her testimony shows, he was of sound mind.

There was no fact or circumstance testified to by any witness for appellants which showed any impairment of the mental faculties of the testator or that the will was the result of any undue influence exerted over the testator by either Wood or his wife at the time the will was made. The testimony of all the other witnesses is to the effect that the testator was of perfectly sound mind at the time the will was executed, and, in fact, that his mind was remarkably well preserved and active for a man of his age, while the testimony of Reiter, who wrote the will, is clearly and positively to the effect that no undue influence was brought to bear upon the testator at the time of the making of the

will or operating upon his mind at that time. Under the evidence the court did not err in finding the instrument to be the last will and testament of John Bazeley. There was no evidence in the record upon which the court could have found otherwise.

The whole theory of appellants' case seems to have been that as the will made an unnatural and unequal distribution of the property, and the testator was sick, feeble and advanced in years and suffering from disease, these facts, standing alone and of themselves, were sufficient to defeat his will. In this they were clearly in error. (*Abrahams* v. *Woolley,* 243 Ill. 365.) The children and grandchildren had no interest in the property of the ancestor and he had a right to make such disposition of the same as he saw fit, and it is immaterial whether the disposition made be regarded as reasonable or unreasonable or just or unjust, so long as it is the will of the testator. (*Brainard* v. *Brainard,* 259 Ill. 613.) Where neither fraud nor undue influence is shown, the courts cannot declare a will void merely because the testator bestows his property upon strangers or relatives by marriage in preference to those to whom he is bound by ties of blood, natural affection or moral duty. (*McCommon* v. *McCommon,* 151 Ill. 428; *Webster* v. *Yorty,* 194 id. 408; *Donnan* v. *Donnan,* 236 id. 341; *Schneider* v. *Manning,* 121 id. 376.) Neither will a will be set aside on the ground of fraud or undue influence where the evidence wholly fails to show any wrongful influence has been exerted or brought to bear upon the testator. The words "undue influence" mean a wrongful influence (*Hurd* v. *Reed,* 260 Ill. 154,) which goes to the extent of depriving the testator of his free agency, so that instead of the will being the will of the testator it is the will of some other person. (*Sears* v. *Vaughan,* 230 Ill. 572; *Hurd* v. *Reed, supra; Beemer* v. *Beemer,* 256 Ill. 312.) Influence secured through kindness, care, solicitation or flattery is not wrongful and does not constitute undue influence, as that term is

used in the law of wills. (40 Cyc. 1146; *Hurd* v. *Reed,* *supra.*) Appellants having charged a lack of mental capacity on the part of the testator and that fraud and undue influence were practiced upon him, had the burden of sustaining those charges. (*Waters* v. *Waters,* 222 Ill. 26.) We find no evidence in the record to sustain either of them. While the will to a certain extent is an unnatural one, we think the reason for the testator making the disposition of the property he did sufficiently appears from the record. The evidence shows that the testator had quarreled with his daughter and that for several years prior to his death they were not on the most friendly terms and that he saw her but once during the last few months of his life, and while it is undoubtedly true that the previous quarrel with the daughter, her seeming neglect and the kindness and solicitation of Wood and his wife for the testator's welfare had an influence upon him in making the will, such influence is not wrongful and will not defeat an otherwise valid will. In *Yorty* v. *Webster,* 205 Ill. 630, we said: "When one from long acquaintance, upright conduct and kindly acts, or even by reasonable persuasion, induces another to favor him in the disposition of his or her property by will he is entitled to such benefit. The law does not attempt to make wills for people but its policy is to uphold wills made by them. The testatrix had the unquestioned right to bestow her bounty where and on whom she pleased. This is so even where there are children, and much more so where those claiming adversely to the provisions of the will stand as collateral heirs."

Under the rule above announced we are of the opinion that the evidence on the part of the appellants wholly failed to establish either the charge of mental incapacity or undue influence made in the bill, and that the decree of the circuit court was right and should be affirmed.

*Decree affirmed.*