MICHAEL E. AUSTIN *et al.* Appellees, *vs.* JOHANNA AUSTIN *et al.* Appellants.

*Opinion filed October 28, 1913—Rehearing denied Dec. 5, 1913.*

1. WILLS—*laymen may express an opinion as to whether testatrix comprehended the nature and effect of her act.* Whether the mind of the testatrix was so affected as to render her incapable of knowing the nature and effect of her act when she executed the will is a question upon which laymen are competent to express an opinion.

2. SAME—*contestants must show, by a preponderance of evidence, that testatrix was of unsound mind.* Persons who contest a will upon the ground that the testatrix was lacking in testamentary capacity must prove, by a preponderance of the evidence, that she did not have sufficient mental capacity to make a valid will at the time she executed the instrument in question.

3. SAME—*the test of testamentary capacity.* The test of testamentary capacity is whether the testator, at the time of executing the instrument purporting to be his will, had sufficient mind and memory to enable him to understand the particular business in which he was engaged, and if he was able to remember who were the natural objects of his bounty, recall to mind his property and make a disposition of it understandingly, according to some purpose or plan formed in his mind, he was possessed of testamentary capacity.

4. SAME—*opinions of physicians on question of testamentary capacity are entitled to no greater weight than opinions of lay-*

*men.* Upon the question whether the testatrix, at the time she executed her will, had sufficient mental capacity to know and understand the effect of her act, the opinions of physicians are entitled to no greater weight than those of lay witnesses of good sense and judgment, whose opportunities for observing the testatrix from day to day were much better than those of physicians.

5. SAME—*when Supreme Court must set aside verdict in will contest case.* Where the testimony as to the mental condition of the testator or testatrix is in serious conflict the Supreme Court is reluctant to disturb the verdict of the jury, but it is its duty to do so, and to reverse the decree, if the verdict is clearly contrary to the weight of the evidence.

APPEAL from the Superior Court of Cook county; the Hon. WILLIAM E. DEVER, Judge, presiding.

CANNON & POAGE, and JOHN B. HEINEMANN, for appellants.

SHEPARD, McCORMICK & THOMASON, (JOHN A. ROSE, and WEYMOUTH KIRKLAND, of counsel,) for appellees.

Mr. JUSTICE FARMER delivered the opinion of the court:

This is a consolidation of two appeals separately prosecuted by appellants from a decree of the superior court of Cook county in a suit brought by appellees to contest and set aside the will of Mary A. Corkery, deceased. The will was executed June 15, 1912, and testatrix died June 21 following. She was a widow and left surviving her no children or descendants of children. Her only heirs were Johanna Austin, her mother; Michael E. Austin, Lawrence Austin and John P. Austin, her brothers; Ella C. Austin, her sister; Leonore Magner, Daniel Magner, Lawrence Magner and Julia Magner, only children of a deceased sister; and James D. Austin and Lawrence Austin, only children of James Austin, a deceased brother. At the time of her death the testatrix owned but one piece of real estate, the value of which is not stated. Her estate amounted to about $440,000.

By the first clause of her will testatrix directed that all her debts, funeral expenses and costs of administration be paid. By the second clause she gave her niece Mary Agnes Austin, daughter of Lawrence Austin, (who is a Sister of Charity, known as Sister Mary Virginis,) her piano. By the third clause she gave her sister, Ella C. Austin, her furniture, plate, silverware, china, jewelry, automobile, books, pictures, paintings, wearing apparel, and all other household effects and property not otherwise disposed of by the will. By clause 4 she gave to the Corpus Christi Catholic Church of Chicago $5000, to be placed in the building fund of said church. Clause 5 gives to the trustee named in the will $35,000 to be held in trust, the net annual income on $10,000 of said trust fund to be paid to testatrix's nephew Lawrence Austin, son of her brother Lawrence, during his lifetime, and the net income on $25,000 of said trust fund to be paid to testatrix's niece Mary Agnes Austin, known as Sister Mary Virginis, during her lifetime. Upon the decease of Lawrence Austin or Mary Agnes Austin, or either of them, the trustee was directed to deliver and pay over his or her share of the principal of the trust fund to Leonore Magner, Lawrence Magner, Daniel Magner and Julia Magner, if living, in equal parts, and in the event of their death before distribution, leaving no descendants, the trust fund was to revert to and become a part of the residuary estate. By clause 6 she gave her mother, Johanna Austin, $90,000. By clause 7 she gave her sister, Ella C. Austin, $90,000. By clause 8 she gave her brother John P. Austin $90,000. By clause 9 she gave Leonore Magner, Daniel Magner, Lawrence Magner and Julia Magner, children of her deceased sister, $22,500 each. By clause 10 she directed the executor and trustee to set aside a sufficient sum, in his discretion, to provide for the care and maintenance of her burial lot. By clause 11 she directed that all the remainder of her estate, real, personal and mixed, be divided into three equal parts, and one part given to her

brother Michael E. Austin, one part to her brother Lawrence Austin, and one part to James D. Austin and Lawrence Austin, children of her deceased brother, James. Clause 12 gives the executor and trustee full power and authority, in his discretion, to sell and dispose of any and all investments, securities and real estate belonging to testatrix for the purpose of paying the bequests made. John A. McCormick is appointed both executor and trustee.

The bill to contest and set aside the will was filed by Michael E. Austin and Lawrence Austin, brothers of testatrix, and her nephews James D. and Lawrence Austin, sons of James Austin, deceased. The Lawrence Austin who was given the income from $10,000 of the trust fund is a son of Lawrence Austin the contestant but was not made a party to the suit by the bill. The grounds of the contest were undue influence and lack of mental capacity. Upon the trial of the case the court took from the jury the issue of undue influence and submitted the case to the jury upon the issue of want of mental capacity. The jury found the instrument offered as the will of Mary A. Corkery was not her will. After overruling a motion for a new trial the court entered a decree upon the verdict setting aside the will and the probate thereof, and proponents have brought the case to this court by appeal.

While errors in the rulings of the court in the admission and rejection of testimony, in giving and refusing instructions, and in some other respects, are assigned and discussed in the brief and argument of appellants, the principal ground upon which a reversal is asked and to which the discussion in the brief and argument of appellants is devoted, is, that the verdict of the jury, and decree of the court thereon, are contrary to the weight of the evidence.

Mrs. Corkery had not been a strong woman for some years, but it was not claimed that her mind became unsound until after May 1, 1912. For the proponents, Miss Adelia Hopkins, for many years an intimate friend of Mrs. Cork-

ery, testified that Mrs. Corkery became sick with her final illness on Thursday or Friday before Easter Sunday, 1912. Miss Hopkins visited her almost every day from that time until her death. She testified that a part of the time Mrs. Corkery was very sick but some days would be feeling very well; that she was out of bed a good deal and a part of the time could go to the library or bath room alone; that about four weeks before she died she had been very sick, but after that her condition improved and witness thought she was going to get well; that Mrs. Corkery was not much of a talker but talked intelligently when she did talk, and conversed with the witness about friends and relatives, also about a trip she and the witness had made together a year or two before and of a trip they contemplated making when Mrs. Corkery was able to go; that she said the Rosary and made proper responses during prayers at different times when witness and others would be saying prayers with her. The witness testified Mrs. Corkery recognized her relatives and acquaintances who visited her during her last illness and spoke with them intelligently. Some days before the will was made she told the witness she had thought a night or two before she was going to die and had wished she had her will made. She said she wanted to give Sister Mary Virginis $25,000 but had not got the matter fixed in her mind yet. She said she wanted to give the new Corpus Christi Catholic Church something, and that she wanted to give her sister, Ella, the things in the house. She went no further at that time about what she wanted to do with her property, except to say she desired to dispose of her property by will rather than have it distributed under the law. Two or three days later she again talked with witness about making a will and about what lawyer she should get to write it, and after some discussion decided to ask John A. McCormick, of the Chicago Savings Bank and Trust Company, to come out to her house and bring with him Edward J. Prescott, secretary of the Chicago Savings

Bank and Trust Company, to write the will. The witness called McCormick over the telephone, who agreed to come and bring Prescott with him. When witness reported this to Mrs. Corkery she told her what she wanted done with her property, and witness wrote it on a piece of paper. She told the witness she desired to give her mother, her sister, Ella, and her brother John, each $100,000 and the Magner children $100,000, and the balance, after these and the other bequests were paid, was to go to her brothers Michael and Lawrence and the two sons of her deceased brother, James. The witness figured up the sum which the bequests amounted to and asked her how much her estate was worth. She replied about $440,000. The witness told her the specific legacies amounted to that sum, leaving nothing for the residuary legatees. She then told the witness to reduce the bequests to her mother, brother, sister and the Magner children to $90,000 each. When McCormick and Prescott arrived witness took the memorandum to them in the dining room, where the will was written. When it came to the appointment of executor and trustee the witness went into Mrs. Corkery's room and inquired whom she desired appointed, and she stated she wished McCormick to be named as executor and trustee. After the will was written, McCormick, Prescott and the witness went into Mrs. Corkery's room, where Prescott read the will to her, asking, after reading each paragraph, whether it was all right or not. She replied it was, and when told she must ask witnesses to sign it, she requested Prescott, the witness, and Augusta A. Gough, a nurse, to sign as witnesses. Mrs. Corkery sat up in the bed, the will was placed on a board in front of her and she signed her name. The witness testified Mrs. Corkery's condition of mind was good at the time she signed the will and had been during all of her last illness and continued so until Thursday before her death, which occurred early Friday morning. The witness was present when Dr. Bassoe called on Mrs. Corkery and also

several times when Dr. Herrick called, and it was at her suggestion that Drs. Herrick and Morgan were called in consultation with Dr. Pigall, the attending physician. She testified there was no difference in Mrs. Corkery's mind at any time until just before her death. She also testified to statements made by Mrs. Corkery indicating that her attachment to those of her relatives to whom she gave the bulk of her estate was stronger than to those who were made residuary legatees.

Edward J. Prescott testified to going to Mrs. Corkery's house to write the will; that he read it over carefully to her before she signed it, asking her questions from time to time as to whether she understood it and whether it was the way she wanted it, to all of which she replied in the affirmative. He testified that from the conversation he had with her and the observations he made of her at that time he believed her mind and memory were sound.

Augusta Gough, a trained nurse, was with Mrs. Corkery from April 19, 1912, until her death. She testified that when she began her service with Mrs. Corkery there was nothing wrong with Mrs. Corkery's speech; that two days later she had an attack of aphasia and for three or four days could not speak, but after that it gradually cleared up. She testified that when Mrs. Corkery could not speak she would indicate her wants, such as a drink of water, by pointing, and that during that time she always knew everybody. The witness testified to a number of incidents, such as the recognition of acquaintances and relatives, the appreciation of flowers and proper responses to prayers. The witness knew nothing about Mrs. Corkery's purpose to make a will until the day it was made, and she signed it as a witness at Mrs. Corkery's request. She stated that Prescott read the will over to Mrs. Corkery before she signed it, asked her if it was the way she wanted it, and she said it was. The will was made on Saturday and Mrs. Corkery died the following Friday morning. The witness testified that there was

260 – 20

no time prior to the day before Mrs. Corkery's death that she did not know how to tell what she wanted, and that her condition until Thursday after the will was made was the same it had been before.

Louise Kilroy, a trained nurse, was with Mrs. Corkery the last six and one-half weeks of her life. She was on duty at night. She testified that when she first went to Mrs. Corkery's the latter recognized her and called her by name. At that time she was rather restless, did not appear able to breathe very well, did not sleep well and would moan a little. Afterwards she seemed to improve until the day before her death. She would ask for anything she wanted. The witness testified the first ten days of her service Mrs. Corkery had some difficulty in forming sentences. She could talk but it was difficult for her to put her words into sentences; that this condition cleared up in about ten days, and that she could talk very fluently the last three or four weeks of her life. The witness testified that in her opinion Mrs. Corkery was of sound mind until within forty-eight hours of her death.

Rev. Edward Dondanville, curate at Corpus Christi Catholic Church, testified he called on Mrs. Corkery on an average of twice a week during her last sickness, and she always greeted him when he came, calling him by name, and never failed to recognize who he was. He recited prayers with her and she made proper responses. He administered the sacraments of the church and heard her confessions. His last visit was on the 16th or 17th of June. He testified she always had difficulty in her speech; that he noticed this on his first visit and that it increased during the next two weeks; that towards the end there was an improvement in this condition. At one time when he visited her she was so confused in her speech that he did not attempt to administer any sacrament to her. He further testified that sometimes when he addressed questions to her she would simply repeat the question instead of answering

intelligently, but he never doubted her understanding. The witness testified that in his opinion she was of sound mind during the period covered by his visits.

Thomas F. O'Gara, priest of Corpus Christi Catholic Church, testified he visited Mrs. Corkery once or twice a week during her last sickness; that his conversations with her consisted in asking her how she felt and if she was getting better. At one period of her illness she could not articulate well. At one time she told the witness she wanted to leave something to him "for the church and those children." He did not know what children she referred to, but supposed the Magner children. It was the opinion of the witness that Mrs. Corkery was of sound mind when he visited her.

Four Sisters of Charity testified to visiting Mrs. Corkery during her last illness, to her recognition of them and that what she said was intelligent. One of the Sisters was asked her opinion as to the soundness of Mrs. Corkery's mind and testified she thought it was sound.

Mrs. Austin, mother of Mrs. Corkery, testified to her visits to her daughter and what occurred or was said on these visits. What she stated her daughter said and did indicated intelligence, and the witness stated she could not say anything else than that in her opinion her daughter was of sound mind.

Michael F. Magner, the father of the Magner children named in the will, testified he saw Mrs. Corkery two or three times a week during her last illness. He testified to conversations had with her during that time, what he heard her say to others, and expressed the opinion that during all her last illness she was of sound mind and knew what she was doing and what she said. Each of the witnesses related conversations with and numerous acts and conduct of Mrs. Corkery which indicated intelligence and were incompatible with unsoundness of mind.

Drs. Sanger Brown, James G. Kiernan and Hugh T. Patrick, called as witnesses for proponents, never saw Mrs. Corkery. They testified as experts, in answer to the same hypothetical questions, that in their opinion she was of sound mind and memory on June 15, 1912. Dr. Martin J. Koch, who examined and had charge of Mrs. Corkery while she was in the sanitarium at Milwaukee, testified he found no brain trouble, aphasia or pericarditis. There was some kidney trouble, displacement of the heart about one-half inch to the left, and high blood pressure, which might mean a hardening of the arteries. Her recuperative powers were very slow but her condition improved some.

Mrs. J. B. Sullivan and Miss Rose Cosgrove, sisters, had for many years been intimate friends of Mrs. Corkery and were with her while she was in the sanitarium at Milwaukee. Mrs. Sullivan testified that Mrs. Corkery was not a well woman but appeared strong and her mind was good at that time. She talked with the witness about her property and to some extent about her family, and said she was expecting soon to receive some money owing to her and that when she received it she would make a will. She mentioned the amount, which, as the witness remembered, was $100,000. She mentioned the fact to the witness that two of her brothers had caused her some annoyance. They were her two older brothers, but she did not mention them by name. Miss Rose Cosgrove testified that Mrs. Corkery talked to her about expecting soon to receive some money she had out at interest, secured by mortgage or bonds; that as witness remembered it the amount was $200,000. Mrs. Corkery said she wanted to make a will but would wait until she returned home and get some advice from friends; that as soon as she returned home and straightened up her household affairs and received the money she was expecting she would make her will.

Proponents proved that on March 27 the Chicago and Western Indiana Railroad Company paid Mrs. Corkery,

for principal and interest on a mortgage note held by her, $204,000.

For contestants Dr. J. S. Pigall testified he had been testatrix's physician for thirteen or fourteen years before her death. He testified that when he began treating her she had Raynaud's disease, which he defined as a disease of the terminal branches of the blood vessels, induced by nervous conditions,—a nervous center where the ends of the toes or terminal parts of the body have poor nutrition; that from the effect of this trouble she lost one or two toes. The doctor also testified Mrs. Corkery had nephritis, or Bright's disease, and arterial sclerosis, and that she was truly anæmic. In the fall of 1911 Mrs. Corkery had some impediment in her speech, which the doctor attributed to aphasia. He gave it as his opinion that this was caused by a small clot of blood in one of the arteries of the brain, which would stop circulation and produce pressure and inaction in that part of the brain. He stated the attack of aphasia cleared up in two or three weeks. In February, 1912, Mrs. Corkery went to Milwaukee to a sanitarium, where she stayed until March 23 and then returned home. He testified she had a second attack of aphasia before she went to Milwaukee, but he could not remember whether it cleared up before she went to that place or not. He was called to see her about the 29th of March, after her return from Milwaukee, and testified she had acute laryngitis, chills and fever and four or five days or a week later took to her bed. For the first two or three weeks after doing so she was able to be up occasionally. Soon after taking to her bed she had an attack of pericarditis, or inflammation of the covering of the heart, which affected her breathing while she was lying down. This condition disappeared or improved in about three weeks but had a weakening effect upon her, as did also nephritis and arterial sclerosis, and that, her anæmic condition continuing, she was nervous. April 18 Dr. J. B. Herrick was called

in consultation with Dr. Pigall and visited Mrs. Corkery nine times between that time and May 28. It is not contended by contestants that Mrs. Corkery became mentally unsound prior to May 1, and the testimony as to her mental capacity is confined to the period intervening between that date and the day of her death. Dr. Pigall testified that about May 1 she had another attack of aphasia and her condition became much worse; that she could not answer questions he asked her, or if she attempted to do so, she would, after long hesitation, repeat a few words of the question; that her ability to understand what others said to her was affected, and that her condition grew worse from day to day until her death. On May 8 Dr. Peter Bassoe, a neurologist, was called in consultation with Drs. Pigall and Herrick.

Dr. Herrick testified that upon his first visit to Mrs. Corkery she was in bed, suffering from chronic disease of valves of the heart; that she had arterial sclerosis, Bright's disease and acute pericarditis, but that the latter ailment lasted only a short time. From that time until May 28 Dr. Herrick saw the patient nine times. He testified that on May 8 a great change had taken place in her mental condition; that she was confused, had difficulty in expressing herself and did not appear to comprehend clearly what was said to her. Sometimes she would not reply to what was said to her, sometimes she would reply in a confused and unintelligent manner, and at other times in a natural and sensible manner. Her mental condition remained about stationary during the time he visited her but the condition of her heart and kidneys grew worse. A mass in the left side of Mrs. Corkery's abdomen the doctor at first thought might be an enlarged spleen, but as time went on it increased in size and had the characteristics of a cancer. What the doctor spoke of as "cerebral accident" he attributed to a hemorrhage of some vessel in the brain.

Dr. Bassoe testified that on the occasion of his one visit to Mrs. Corkery he received a history of the case from the other doctors and spent about a half hour in her room. He asked her a number of questions and to do a number of things in making his examination of her. In reply to an inquiry as to who the other doctors were she correctly named them. When requested to touch her right ear with the left forefinger, or *vice versa,* she was unable to do so. The doctor gave her a safety pin and asked her what it was, but she was unable to tell him. He told her what it was and asked her to open it, which she did after some time, using both hands in doing so. Among the tests he subjected her to was what he called the Babinski test, which he testified was considered very reliable in determining whether there was an organic lesion in the brain or spinal cord. The test indicated there was such lesion. From that and other tests made and symptoms indicated, he testified that in his opinion both sides of Mrs. Corkery's brain were affected. She had difficulty in understanding others or in expressing herself, was restless and exhibited a certain amount of mental excitement. She had both motor and sensory aphasia. The former affects the ability to speak or write and the latter the ability to understand other persons or their writing. The doctor further testified that Mrs. Corkery's heart was enlarged; there was a large mass in the region of the spleen; that she had hardening of the arteries and was quite anæmic. He testified the lesion she had was softening of the brain, due to a hemorrhage or blood clot,—in all probability the latter; that her mental condition was due to this brain disturbance in part but not wholly; that he had difficulty in deciding in his own mind how much of the trouble was due to aphasia and how much to simple mental failure. He testified that in order for the mental condition to improve the physical condition would have to improve; that there would have to be an improve-

ment in the circulation, which would require considerable time in Mrs. Corkery's case or condition.

Dr. William E. Morgan was called to see Mrs. Corkery once, the latter part of May or the first of June. He testified he found her suffering from a malignant growth in the abdomen; that her heart was somewhat dilated and irregular; that she had hardened blood vessels, was very weak, pale and anæmic. He asked her some questions, which she repeated after him but did not answer them.

The foregoing is a brief statement from the voluminous testimony of Drs. Pigall, Herrick, Bassoe and Morgan of some of the more important conditions upon which they based their opinions as to the condition of mind of Mrs. Corkery. Dr. Pigall testified that from June 1 until her death Mrs. Corkery was unable to understand and correctly answer questions, and that on June 15 she had not sufficient mental capacity to transact business of any kind. Dr. Herrick testified he saw Mrs. Corkery the last time on May 28 before her death; that she did not have sufficient mental capacity to transact business of any kind. Dr. Bassoe testified that when he saw Mrs. Corkery on May 8 she was not able to transact business, and in answer to a hypothetical question which assumed she grew progressively worse, physically and mentally, from the date of his visit until her death, he gave it as his opinion that she had not sufficient mental capacity on June 15 to transact business of any kind. Dr. Morgan testified that in his opinion Mrs. Corkery had not sufficient mental capacity to transact business of any kind on the day he saw her, the latter part of May or first of June. Bertha Emerson, a trained nurse, was with Mrs. Corkery from April 5 to May 7. She testified the last two and one-half weeks of that time Mrs. Corkery was practically a bed patient, and after describing her inability to talk or understand what was said to her and narrating a number of unusual acts of Mrs. Corkery, she gave it as her opinion that she was not of sound mind.

Della Howe Forbes was a maid at Mrs. Corkery's house during her last illness and until her death. She described acts and conduct of Mrs. Corkery which would indicate mental disturbance, but was not asked to express an opinion as to whether she was of sound or unsound mind. This is a brief outline of the most material parts of the testimony of the witnesses for contestants. Some other witnesses testified in behalf of the respective parties, but we do not regard their testimony as of importance upon the issue of Mrs. Corkery's mental capacity.

Of the witnesses who testified to the soundness of mind of Mrs. Corkery, Miss Hopkins was with her almost every day during her last illness; Miss Gough was her day nurse from about April 19 until her death; Miss Kilroy was night nurse from about the first of May until she died; Mrs. Austin, Mr. Magner and the two clergymen, O'Gara and Dondanville, visited her frequently during her last illness; Prescott saw her the day the will was executed, and Sister Mary Mark, who had known her many years, saw her two or three weeks before her death. Of the witnesses who testified on behalf of contestants, Dr. Pigall was Mrs. Corkery's family physician for thirteen or fourteen years and treated her during her last illness; Dr. Herrick visited her about nine times from April 18 to May 28; Dr. Bassoe saw Mrs. Corkery once, on May 8; Dr. Morgan saw her once, the latter part of May or first of June; and Miss Emerson was Mrs. Corkery's nurse from April 5 until May 7. Seven of proponents' witnesses were with Mrs. Corkery much oftener during her last illness than were any of the witnesses of contestants except Dr. Pigall and Miss Emerson, and some of proponents' witnesses saw much more of her than either of them. It is true, none of proponents'·most important witnesses were of the medical profession, and four of the five important witnesses for contestants were doctors. The record shows they were able and capable members of their profession. As to the dis-

eases from which Mrs. Corkery suffered, they were much more competent to determine and express an opinion than were the lay witnesses. There is no question but that Mrs. Corkery suffered from a complication of diseases during her last illness and that she had not been a strong and healthy woman for a long time. Whether her mind was so affected as to render her incapable of knowing the nature and effect of her act when she executed her will is a question upon which laymen are competent to express an opinion. *Keithley* v. *Stafford,* 126 Ill. 507; *Ring* v. *Lawless,* 190 id. 520.

Ordinarily, in cases of this character, when the testimony as to mental capacity is conflicting, we are reluctant to reverse a decree on the ground that it is contrary to the weight of the evidence, but where it is clearly so it becomes our duty to reverse the decree. In this case we cannot escape the conviction that the verdict of the jury and the decree thereon are contrary to the clear weight of the testimony. It is incumbent on the contestants to prove by a preponderance or greater weight of the evidence that Mrs. Corkery did not have sufficient mental capacity to make a valid will at the time she executed the writing offered in evidence as her will. The test of testamentary capacity is, did the testator, at the time of executing the instrument purporting to be his will, have sufficient mind and memory to enable him to understand the particular business in which he was then engaged? If he was able to remember who were the natural objects of his bounty, recall to mind his property and make disposition of it understandingly, according to some purpose or plan formed in his mind, he was possessed of testamentary capacity. (*Craig* v. *Southard,* 148 Ill. 37; *Campbell* v. *Campbell,* 130 id. 466; *Ring* v. *Lawless, supra; Drum* v. *Capps,* 240 Ill. 524.) It is not denied that Mrs. Corkery was of sound mind in March, when she talked with Mrs. Sullivan and Miss Cosgrove of her intention to make a will. It is clear from their testi-

mony that she desired to control the distribution of her property herself rather than allow it to be distributed under the laws of descent. She desired to postpone the making of her will until she returned to Chicago and collected the $200,000 owing to her from the Chicago and Western Indiana Railroad Company. She collected that indebtedness on the 27th of March and three days later was taken with the illness from which she never recovered. The witness Adelia Hopkins could not fix the date when Mrs. Corkery first spoke to her about making a will, but said it was some days before the will was executed. At that time she said she wished to give her niece, known as Sister Mary Virginis, $25,000, something to the Corpus Christi Catholic Church, and the things in the house to her sister, Ella. She said at that time she did not have the plan for the distribution of her property in her mind, but that she desired to dispose of it by will rather than have it distributed under the law. A few days later she asked the witness to procure a lawyer to draw the will and told her how she wanted her property disposed of. The witness further testified she wrote down the bequests Mrs. Corkery told her she wished to make, and when she added them up she inquired of Mrs. Corkery what her estate was worth. She replied about $440,000. When informed by the witness that the specific bequests amounted to that sum, so that there would be nothing left for the residuary legatees, Mrs. Corkery told her to reduce the $100,000 bequests to $90,000, and the will was drawn accordingly. If this testimony was true Mrs. Corkery had sufficient mental capacity to know the nature and extent of her property. The will itself indicates that she had in mind all the natural objects of her bounty, for they were all provided for by bequests in substantial amounts. Lawrence Austin, who is given the income from a trust fund of $10,000, is a blind son of Mrs. Corkery's brother Lawrence, who is one of the residuary legatees. These circumstances are supplemented

by the testimony of the witnesses for the proponents, who were disinterested and not related to any of the parties, that Mrs. Corkery was of sound mind, and this is not overcome by the testimony of the contestants. With the exception of Dr. Pigall none of the doctors who testified for the contestants saw Mrs. Corkery at a later date than two weeks or more before the will was executed, and two of them never saw her but one time. Miss Emerson, the nurse, never saw her after May 7, which was five weeks before the will was executed. The opportunities of proponents' witnesses for observing Mrs. Corkery's mental condition were much better than those of any of contestants' witnesses, with the exception of Dr. Pigall. Unless, therefore, it is to be said that the testimony of the medical witnesses who testified on behalf of the contestants is entitled to greater weight than the testimony of non-medical witnesses, it must be held that the weight of the proof is in favor of the proponents. It has never been held in this State that the testimony of doctors upon the subject of mental capacity is entitled to any greater weight than that of laymen who are men of good common sense and judgment. In *Carpenter* v. *Calvert,* 83 Ill. 62, it is said: "Physicians may be regarded experts as to the condition of the body and as to what diseases tend to impair the mind, but it does not follow from the mere fact that they are physicians that they are any better judges of the degree of mental capacity than other men of good common sense." The witnesses who testified for proponents were intelligent, and, omitting the mother and brother-in-law of Mrs. Corkery, were not related to any of the parties, and nothing in the record indicates that they were any less sincere, truthful and reliable than the witnesses for contestants.

We cannot sustain the decree on the testimony in this record, and it is therefore reversed and the cause remanded.

*Reversed and remanded.*